**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
SETH INDIGO CARNES,

              Plaintiff,

  -against-                                 Case No. 7:26-cv-01619-PMH

TOWN OF ROCKLAND; DANIEL SFERRAZZA;      **Second Amended**
and TROUT TOWN PROPERTIES 48 LLC,         **Complaint**

                      Defendants.
-------------------------------------------------------------X

Plaintiff Seth Indigo Carnes, by and through his undersigned counsel, alleges as follows:

## PRELIMINARY STATEMENT

1. This is a civil rights action brought pursuant to 42 U.S.C. § 1983 to redress suppression of Plaintiff's protected artistic and political expression in violation of the First Amendment to the United States Constitution and Article I, sections 8 and 11 of the New York Constitution, and an action under the Visual Artists Rights Act, 17 U.S.C. § 106A, to redress the destruction of Plaintiff's work of visual art.

2. Plaintiff Seth Indigo Carnes is an artist who entered into a lawful contract in the summer of 2025 to paint a mural on the outer side wall of a furniture store in Roscoe, New York, within the Town of Rockland (the "Town"), owned by Defendant Trout Town Properties 48 LLC, whose sole member is Defendant Daniel Sferrazza (together "Building Owner Defendants" or "Building Owners").

3. The mural, intended as a core artwork in Carnes' Miniluv art project, was to consist of the poetic phrase "time to unperson," painted in large white letters on a black background (the "Mural").

4. The parties' contract provided that the furniture store would keep and maintain the Mural for a period of at least two years following the date of completion.

5. While Carnes understood that the furniture store had control over the wall, Building Owner Defendants were also informed about the Mural and did nothing to prevent its installation. The Mural was thus an authorized work, created with the permission of the furniture store with the expectation that it would remain in place for a substantial period of time.

6. While Carnes was painting the Mural, a local resident, Phil Vallone, approached and aggressively ordered Carnes to stop, asserting that the Mural was "vulgar" and "divisive" and that Vallone would use his political connections within the Town to have it painted over immediately.

7. Later the same day, other men appeared at the site, either stating they had been instructed to paint over the Mural by Vallone or that it would be painted over within 24 hours.

8. Carnes took the threats of vandalism seriously, and later in the day went to the New York State Police barracks in Roscoe to report the incident out of concern for imminent vandalism or a physical confrontation.

9. The same night, Carnes had a call with the Town's Town Supervisor, Robert Eggleton ("Town Supervisor" or "Town Supervisor Eggleton"), who indicated that he had spoken with Vallone, concurred that the Mural's message was offensive, and would be instructing the Town's Town Code Enforcer, Glenn A. Gabbard ("Town Code Enforcer" or "Code Enforcer Gabbard"), to issue a citation regarding the Mural.

10.     Carnes, reasonably fearing he would be fined and/or subjected to vigilante justice if he continued painting, stopped work on the Mural with half of the phrase painted.

11.     Roughly a week later, a pretextual citation was issued by the Town Code Enforcer to Defendant Trout Town Properties 48 LLC, the owner of the building on which the Mural was painted, purportedly for violating the Town's signage ordinance in installing a sign without a permit and threatening a fine and imprisonment.

12.     The citation was issued despite the fact that (i) the plain language of the ordinance indicates it does not cover an artistic mural, (ii) that the ordinance expressly exempts political statements and statements of personal opinion, and (iii) that other similarly sized murals prominently displayed in the Town did not obtain permits and have not been subject to citations or other enforcement.

13.     The Town's actions, including its content-based retaliatory enforcement against Carnes and its maintenance and enforcement of a content-based signage ordinance that vests officials with unbridled discretion over protected expression, violated Carnes' free speech rights under the federal and New York State constitutions.

14.     Although the Town ultimately directed its formal enforcement action at the owner of the building on which the Mural was being painted, Carnes was the target and victim of that enforcement. The Town Supervisor personally told Carnes to change his message, personally warned Carnes that the Town Code Enforcer would be directed to act, and then followed through. The Town was aware that the Mural consisted of expressive speech but issued the citation regardless. The citation was not incidental to Carnes, it was the instrument through which the Town silenced him. It deprived Carnes of the surface on which he was authorized to paint, leveraged the Building Owners into pressuring Carnes

to abandon the mural, and left Carnes facing the ongoing threat that completing his artwork would trigger further penalties against him or his contractual partner. Carnes conceived the Mural, paid for it, created it, and was forced to stop.

15. On or about March 8, 2026, the Mural was destroyed. Rather than preserve the work or refuse to participate in its suppression, Building Owner Defendants participated in, authorized, ratified, and/or permitted the painting over and destruction of the Mural.

16. Neither Carnes nor the furniture store was informed of or consented to the destruction of the Mural.

17. The Mural is a work of visual art within the meaning of the Visual Artists Rights Act ("VARA"). By intentionally destroying or by permitting destruction of that work, Building Owner Defendants violated Carnes' rights under 17 U.S.C. § 106A.

18. This case is about a Town's censorship of protected artistic and political expression, and the subsequent participation of local actors in the destruction of an authorized work of art, all because the officials and local actors involved objected to the message it conveyed. The First Amendment forbids the first. VARA forbids the second. Carnes comes to this Court to enforce both.

**JURISDICTION AND VENUE**

19. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

20. This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because the events giving rise to this action occurred within this District, and at least one of the Defendants is situated in this district.

## PARTIES

22. Plaintiff Seth Indigo Carnes is an artist and resident of Roscoe, New York.

23. Defendant Town of Rockland is a municipal corporation organized and existing under the laws of the State of New York. Roscoe is within the Town of Rockland.

24. Defendant Trout Town Properties 48 LLC is a domestic limited liability company organized and existing under the laws of the State of New York.

25. Defendant Daniel Sferrazza is an individual who resides on Long Island, New York, and owns property in Sullivan County, New York.

## FACTUAL ALLEGATIONS

26. Plaintiff Seth Indigo Carnes is a professional artist whose art often incorporates political and literary themes.

27. Carnes lives and works in both New York City and Roscoe, New York, which is within the Town of Rockland.

28. He has a multidisciplinary practice, focused on language art, public art, digital art, cinema, performance, installation, research, and publishing.

29. His artwork and projects have been featured in a variety of art venues, including PS1 MoMA, the Chicago Museum of Contemporary Art, the Emily Harvey Foundation, Microscope Gallery, Garis & Hahn, AC Institute, the New York Digital Media Salon, and White Box, and he has performed throughout the United States, in Europe, and Japan.

30. Carnes' "iheart" project from 2008-2013 was a conceptual, pop-oriented series that featured artwork, installations, performances, and interventions in galleries, as public art, and via publication.

31. In 2009, a public mural from the "iheart" project protesting the erasure of historical graffiti on the Highline in New York City was featured in the *New York Times*.

32. From 2023 to 2025, as part of the TXT collective, Carnes researched and co-authored the Artist's Contract for Decentralized Art (ACDA), an open-source legal agreement for use in the transfer of decentralized art. The contract and its surrounding work, focused on artist rights and historical connection with the Artist's Reserved Rights Transfer and Sale Agreement, were published in *Circulation*, Issue 001 and released in January 2026 via Printed Matter, Dalezine, and Metalabel.

33. On June 27, 2025, Carnes and the owners of the Sunday Home furniture store entered into a written agreement for Carnes to paint a mural artwork on the exterior wall of the store, located at 48 Stewart Avenue in Roscoe, New York.

34. The wall of the building is prominently situated on a main thoroughfare through the town, which also serves as an artery for traffic heading to other destinations in the Catskill Mountains.

35. The building in which Sunday Home operates is owned by Trout Town Properties 48 LLC, whose sole member is Daniel Sferrazza (together "Building Owner Defendants").

36. Pursuant to Sunday Home's agreement with Building Owner Defendants, Sunday Home controls the outer wall of the building and could, and did, authorize the Mural without needing any approval from Building Owner Defendants. Nonetheless,

Building Owner Defendants were aware of the plan for the Mural and indicated no objection.

37.     As described in the agreement, "The Mural artwork consists of large-scale poetic phrase, 'time to unperson', painted artist signature in the form of a symbol, and '#miniluv' hashtag. The Mural is part of the Artist's ongoing Miniluv project that began in Narrowsburg as a contemporary public art project connected to the Deepwater Literary Festival and continues upstate, New York City, and beyond."

38.     The Miniluv project uses short poetic phrases to satirize slogans, branding, and human behavior. Using the political language of authors like George Orwell, advertising, self-help, and social media, the project's slogans aim to elicit interpretations that reflect the viewer's core self and identity.

39.     The Miniluv project was conceived in 2023, and work from the project was featured in the Deep Water Literary Festival in Narrowsburg, New York, as well as the Spring Break Art Fair in Los Angeles, California. Work from the project remains in front of the Delaware Valley Art Alliance in Narrowsburg today.

40.     Carnes, pursuant to the agreement, was to pay ninety-three percent (93%) of the Mural's costs in exchange for an artist's fee and Sunday Home's representation that the Mural would be maintained for at least two years following its completion, giving Carnes a substantial economic and expressive stake in the mural.

41.     The Mural consisted of the phrase "time to unperson," created by Carnes, rendered in large white letters on a black background.

42.     The term "unperson" is drawn from George Orwell's novel *1984*, which features an imagined totalitarian state that ruthlessly censors its citizens, and conveys

7

political and literary commentary on censorship, erasure, authoritarianism, and human agency.

### The Mural Installation

43.     Carnes began painting the Mural on or about July 21, 2025.

44.     On the morning of July 25, 2025, while Carnes was on the scaffolding painting the Mural, a private citizen, Phil Vallone, confronted Carnes and demanded that he cease work, calling the Mural "vulgar" and "divisive."

45.     Vallone claimed he had political connections in the Town's government, knew Defendant Sferrazza, and would cause the Mural to be taken down.

46.     Carnes called Defendant Sferrazza, who asked Carnes to stop painting for the time being. Later in the day, Defendant Sferrazza told Carnes that he was going to stay neutral in any dispute about the contents of the Mural, and that "whatever you guys want to do, you guys do," referring to Carnes and Sunday Home.

47.     Defendant Sferrazza communicated the same message to the owners of Sunday Home.

48.     Defendant Sferrazza had knowledge that Sunday Home and Carnes had an agreement regarding the Mural, knew of the Mural's content, never insisted that Carnes or Sunday Home paint over the mural, and never suggested that he had the authority to make such a demand.

49.     Carnes continued to work on the Mural, beginning to outline the "t" in "to unperson."

50. Later the same morning, another man approached Carnes on the scaffolding, stating that he was instructed by Vallone to paint over the artwork. Carnes told the man he had the store's permission to paint the Mural, and the man ultimately left.

51. Faced with these credible threats, Carnes decided to stop painting for the day, but put up "no trespass" and "no vandalism" signs, as well as a surveillance camera, to prevent the Mural from being destroyed in his absence.

52. As he was affixing the signs on the scaffolding with masking tape, a third man approached Carnes, and, reinforcing the credibility of the threats, aggressively asserted that the artwork would be painted over that night, while also referring to the Mural as "vulgar."

53. At around 8 p.m. on the evening of the same day, Carnes walked to the New York State Police barracks in Roscoe to report the credible threats of vandalism and destruction of private property, as well as his fears for his health and safety. An officer informed Carnes that he would increase patrols and police presence around the Mural that night to help deter vandalism or other crimes.

54. Later that evening, Carnes had a telephone call with Robert Eggleton, the Town of Rockland's Town Supervisor.

55. The Town Supervisor is the Chief Executive Officer in the Town and is responsible for the day-to-day operation of town business, establishes all committees and appoints their members, appoints liaison officers, and a deputy supervisor.

56. The Town Supervisor is also the Town's Chief Administrative Officer, responsible for carrying out town board decisions.

57. On the call, Town Supervisor Eggleton informed Carnes that Vallone and other unidentified individuals called him earlier in the day to complain that the Mural was "vulgar" and "offensive."

58. Carnes explained to Town Supervisor Eggleton that he had been subjected to threats of vandalism and intimidation related to the Mural's message.

59. Town Supervisor Eggleton explained to Carnes that he understood why people found the Mural's language divisive based on his own interpretation of the term "unperson."

60. Town Supervisor Eggleton explicitly encouraged Carnes to rethink the Mural in its entirety to display a different message.

61. Only then, without any formal enforcement review, did Town Supervisor Eggleton assert that the Mural needed a signage permit from the Town and that he would refer the matter to Town Code Enforcer Gabbard, and instruct him to issue a citation.

62. In other words, Town Supervisor Eggleton did not initially cite any neutral zoning or safety concern, but first expressed agreement with complaints about the Mural's purportedly offensive message and suggested Carnes change the Mural's message before invoking the signage ordinance.

63. Based on an objectively reasonable fear that he could be fined, arrested, or even physically attacked if he continued to paint the Mural, Carnes stopped work.

64. Sunday Home never demanded that Carnes stop work on the Mural or remove it based on its content or as a result of the opinions or threats of private citizens.

65. Over the subsequent days, Carnes made efforts to reach out to Vallone, Town Supervisor Eggleton, and other Town agents and members of the community to

10

attempt to find a solution, including through a mediation, but the Town was largely unresponsive.

### Opening Reception

66.    On August 3, 2025, an "opening" reception was held for the mural at Sunday Home.

67.    The reception was held despite the fact that the mural was not completed as scheduled, with the "t" in "to unperson" still unfinished.



*Fig. 1: Status of the mural at opening reception, photo taken September 3, 2025*

68.    At the reception, Carnes' artist statement was available as a printout for all attendees, who were encouraged to write their interpretation of the Mural on index cards.

69.    Carnes' artist statement noted that, "As a mural installation from the [Miniluv] project unfolds in Roscoe, New York, different meanings arise from early interpretations. Some viewers report a message about release from attachment to the self and identity. A local shopper felt that it meant she could be free to buy any interior design objects and not be judged by others. Another person said it means men should leave their

wives and engage in homosexuality. The range of reflections on meaning in an artwork can be as diverse as those who view it. In this context, art is a mirror. At the moment, the mural lies halfway finished, with work paused from unexplained claims of vulgarity and threats of vandalism. Here in Roscoe, a few words on a wall reveal how perceptions of self, community, power, and difference can yield a choice between two paths: censorship or tolerance."

70.   An unknown man showed up at reception and yelled homophobic epithets at the attendees, claiming, "It's art to you, but it's bullshit to the rest of us."

71.   The reception had been planned as a showcase for the completed Mural and Carnes' Miniluv project. Instead, because the Town's actions forced Carnes to stop painting, the mural was presented to attendees incomplete. The event, which should have served as a professional milestone and an opportunity to generate future commissions and public engagement with Carnes' work, instead became an exhibition of the chilling effect of the Town's conduct.

### The Citation

72.   On August 5, 2025, without any opportunity for a hearing prior to issuance, Town Code Enforcer Gabbard issued a citation to "Trout Town Properties #48," the owner of the Sunday Home building.

73.   The citation states that it is for a violation of "Rockland Municipal Code\Chapter 185 Zoning\Section 185-30.2 Signs, E (1) Permit."

74.   The citation threatened that failure to remove the mural would "constitute an offense punishable by fine imprisonment or both."

75.   The Rockland Municipal Code defines "sign" as:

A name, identification, display, announcement, declaration, device, demonstration or illustration which is affixed to or painted or represented directly or indirectly upon a building, structure or parcel of property and which directs attention to an object, product, place, person, activity, institution, organization or business and is intended to attract attention or propose a commercial transaction.

76. The Rockland Municipal Code provides that permits are not required for several classes of signs, including "statements of personal opinion," "statements of protest," and "political signs."

77. The Mural does not qualify as a sign under the Rockland Municipal Code as it does not direct attention to an object, place, person, activity, institution, organization, or business and does not propose a commercial transaction.

78. Even if it could be considered a "sign," the Town's signage ordinance exempts political signs and expressions of personal opinion from permit requirements. Rockland Municipal Code §185-30.2(C)(20)–(21).

79. The Town's enforcement action regarding Carnes' mural was not based on neutral zoning concerns but was triggered by objections to the Mural's message by a politically connected member of the community and by government actors, including the Town Supervisor and Town Code Enforcer.

80. Acting in his official capacity as Town Supervisor and using the authority of that office, Town Supervisor Eggleton directed Town Code Enforcer Gabbard to initiate enforcement against the Mural. That direction was never reversed or disavowed by the Town Board or any other Town authority.

81. The Town's selective enforcement of the sign code is evidenced by the fact that there are several other murals within the Town of similar size for which no permit was

13

sought or obtained and no citation has been issued. *See* section below "Comparator Murals and Selective Enforcement."

82.  The citation remains in effect, and the Town has not disavowed enforcement, despite Carnes alerting the Town and its agents on several occasions over the following months that it violates his free speech rights.

83.  As a direct result of the Town's actions and while attempting in good faith to negotiate a resolution, Carnes halted further work on the Mural to avoid escalating conflict and the risk that the Town would take additional enforcement action against him or the Building Owners.

84.  The Town has not withdrawn, rescinded, or disclaimed its enforcement position as to the Mural.

85.  Because the Town has already taken the position that the Mural violates the sign code, and because the Town has not disclaimed future enforcement, Carnes faces a credible and ongoing threat of enforcement if he were to repaint the Mural.

86.  Carnes' decision not to complete the Mural is objectively reasonable and directly traceable to the Town's threats and enforcement actions.

87.  The Town's actions thus caused – and continue to cause – Carnes concrete injury, and the relief requested would redress that injury.

**Sunday Home Challenges the Citation**

88.  After the issuance of the citation, on August 10, 2025, Sunday Home sent an email to Code Enforcer Gabbard, asking for clarification as to what "sign" the citation referred to.

89.     Code Enforcer Gabbard replied on August 11, 2025, "The buildings' owner received the order. Signage (including murals) requires a review by this office and the issuance of an Accessory Use Permit. Signs are regulated through Rockland's Zoning Law."

90.     Sunday Home responded later the same day, explaining to Code Enforcer Gabbard that Sunday Home was the tenant and business operator at 48 Stewart Avenue, and was "the party responsible for commissioning the mural" and that: (1) the mural is art, not a sign under section 185-30.2; (2) that the mural is artistic expression protected by the First Amendment; (3) that neither Sunday Home nor the building owner were given the opportunity to be heard before the threat of enforcement; and (4) Sunday Home demanded the withdrawal of the citation or that the Town "[p]rovide a written explanation of the statutory authority for classifying this noncommercial mural as a 'sign' requiring a permit under § 185-30.2."

91.     A Town record produced in response to FOIL reflects that, later that same day Code Enforcer Gabbard wrote, "[t]ough situation, business owners giving [Town Supervisor] and me complaints." He further acknowledged, "it's speech and protected," while asserting that he believed its size exceeded the ordinance's size limits.

92.     The FOIL production did not include any response by the Town to Sunday Home's August 11, 2025 email. On information and belief, none was provided.

### Town Councilwoman Encourages Carnes to Change Mural

93.     After the issuance of the citation, on August 23, 2025, Carnes had a call with Christine Routledge, a council member for the Town regarding the Mural.

94.     Councilwoman Routledge asked Carnes if he was willing to change the content of the Mural, noting that Vallone had donated a lot of money to the Town and wanted a mural in line with Roscoe's branding as "Trout Town USA, adventure, and relaxation."

95.     Councilwoman Routledge also stated that she had spoken with Town Supervisor Eggleton, who also felt that the Mural should have a different message more in line with Roscoe's branding.

**Press Coverage of the Mural and Public Support**

96.     The Mural has been the subject of considerable discussion in the art community in the Catskills and has attracted press coverage.

97.     Before the citation was issued, *Manor Ink*, a newspaper in Sullivan County, covered the installation of the Mural, stating, "A new Miniluv wall installation went up in Roscoe on the side of Sunday Home's storefront at 48 Stewart Avenue. The enigmatic poetic phrase, 'time to unperson,' . . . extends the ongoing contemporary art project across the Catskills."

98.     The day before the citation was issued, on August 4, 2025, *River Reporter*, a community newspaper in the region, covered the Mural, leading that "[a] mural on the side of a furniture store in Roscoe remains unfinished after backlash from members of the Roscoe community caused the artist to pause work on the project." The article referenced Carnes' Miniluv series, and quoted Sunday Home's co-owner as representing that "a good portion of the community has given the mural a very positive response."

99.     Following the issuance of the citation, *ArtKill*, a magazine covering the Catskill region's thriving art scene, devoted a full spread to the Mural in its autumn 2025

issue. The article's author reflected, "Artwork that is truly good should create a dialogue. It should be open to interpretation. Compelling artists don't tell you what to think; they simply put an idea out in the world for viewers to contemplate. I believe that is what [Carnes] is doing with his mural."

100.    *Manor Ink* later covered the Town's censorship described above, which prompted the magazine to publish two letters to the editor supporting Carnes. In one, the author stated that "I support public art and see this mural as a welcome contribution to the community."

101.    Also in autumn 2025, a petition was started on the website MoveOn.org. The petition described the Mural as an "artwork," noted that it was "part of the Miniluv project," and quoted from Carnes' artist statement.   As of March 30, 2026, the petition has 177 signers, with the majority being local to the area.

## The Town Pressures the Building Owner

102.    The selective nature of the Town's enforcement actions was confirmed in a phone call Carnes had with Defendant Sferrazza on September 11, 2025.

103.    Defendant Sferrazza stated to Carnes that he was "getting phone calls from the Town itself, they're not happy."  Defendant Sferrazza explained that the Town was trying to "scare and intimidate" him and that he was fearful that the Town would issue more citations to the property or properties he owned in the Town, in retribution and as a pressure campaign, trying to force him to paint over or condone painting over the Mural.

104.    Defendant Sferrazza was also Carnes' residential landlord at the time and until December 15, 2025, and suggested in the phone call with Carnes that the Town was also pressuring him to evict Carnes from his home, despite the parties' lease agreement.

105. As Carnes did not want to be living in a home while the Town was pressuring his landlord to evict him, Carnes moved out of the property, losing his security deposit of $1,350.00 in the process.

106. Defendant Sferrazza, who initially was supportive of the Mural, then after controversy and citation from Town, decided to remain neutral, expressed serious concern on the phone call that the Town would enact punitive measures against him and his properties for remaining neutral.

107. On information and belief, the Building Owner Defendants' stance remained neutral until the week of February 15, 2026, when Defendant Sferrazza removed Carnes' surveillance camera that was watching the Mural and told an officer at the New York State Police barracks in Roscoe that he was considering painting over the Mural himself, asking if it would be legal to do so, noting he was concerned that he was being targeted with citations from the Town for not attempting to remove the Mural.

### The Destruction of the Mural

108. On or about March 8, 2026, the Mural was destroyed.

109. The destruction occurred roughly two to three weeks after Defendant Sferrazza removed the surveillance camera directed at the Mural and told a state trooper that he was considering painting over it.

110. On information and belief, Defendant Sferrazza was seen in the immediate area of the Mural on the day it was painted over.

111. On information and belief, Defendant Sferrazza personally participated in, directed, authorized, ratified, and/or permitted the painting over of the Mural, and

18

Defendant Trout Town Properties 48 LLC, as owner of the building, likewise authorized, ratified, permitted, and/or failed to prevent the destruction of the Mural.

112.    The destruction was carried out by painting over the white lettering in solid black.



*Fig. 2: Status of the mural after it was painted over, photo taken March 11, 2026*

113.    Neither Carnes nor Sunday Home consented to the destruction of the Mural.

114.    Neither Carnes nor Sunday Home were provided with any notification, oral or written, that the Mural would be destroyed.

115.    The Mural was painted directly onto the exterior wall surface of the building. Because of the nature of the medium and surface, the Mural could not be removed intact without being destroyed, distorted, mutilated, or otherwise materially altered.

116.    Building Owner Defendants had actual knowledge that the Mural was an artwork created by Carnes, that Carnes claimed rights in it, and that it was the subject of a written agreement for continued display.

19

117.    Carnes had even separately informed Defendant Sferrazza about the Visual Artists Rights Act, 17 U.S.C. § 106A ("VARA"), that the Mural was protected as a work of visual art and could not be destroyed.

118.    Carnes' counsel had sent a litigation hold to Defendant Sferrazza regarding the Mural on February 19, 2026.

119.    Despite that knowledge, Building Owner Defendants caused the Mural to be painted over without Carnes' consent.

120.    The Mural's stature was recognized by members of the community, the local art scene, art institutions (including Delaware Valley Art Alliance, Catskill Art Space, as well as their individual board members and curators), several professional artists (including DJ Spooky, Derick Melander, and G.H. Hovagimyan), cultural journalists (including Carlo McCormick), attendees at the opening reception, Sunday Home, and others familiar with Carnes' work and the Miniluv project, who regarded it as a significant contemporary public artwork within Carnes' ongoing Miniluv series.

121.    Those who encountered and discussed the Mural understood it not as mere decoration or signage, but as a serious artistic intervention engaging themes of censorship, political language, poetics, and public discourse. Within the relevant art community, the Mural was recognized for both its artistic merit and its intellectual and political resonance.

122.    Installed in a prominent location for both local residents and those traveling throughout the Catskills, publicly presented, and discussed within the relevant art community, the Mural was recognized not simply because it attracted attention, but because it was regarded as an artistically and conceptually important work.

20

123.    Carnes began painting the Mural on or about July 21, 2025, and the Mural was fixed on the building wall in a sufficiently permanent form to be perceived, reproduced, and photographed over a period of more than transitory duration. At the time Building Owner Defendants caused it to be painted over, substantial portions of the Mural had been completed and remained visible on the wall, and was exhibited to the public as a work of art.

124.    Before destroying or permitting the destruction of the Mural, Building Owner Defendants did not provide Carnes with any written notice – by registered mail, certified mail, or otherwise – of their intention to paint over or destroy the Mural, and did not afford Carnes any opportunity to remove or preserve it.

125.    This is despite Defendant Sferrazza receiving a litigation hold from Carnes' counsel regarding the Mural just weeks before.

126.    The painting over of the Mural destroyed Carnes' artwork and deprived him of the ability to complete, exhibit, and maintain it as intended. It also harmed his reputation by obliterating a public artwork that formed part of his ongoing body of work and by preventing the public from viewing the work as intended.

### Comparator Murals and Selective Enforcement

127.    There are other murals within the Town installed in recent years of a similar size as Carnes' mural.

128.    These murals, like the Mural, are prominently visible from public rights of way and are well known to the Town and its agents.

129.    For example, there is a large 54 by 32-foot mural located at 66 Stewart Avenue in Roscoe, New York featuring a woman fly fishing with the phrase "Trout Town USA" that was installed in or around November 2023.

130.    There is another large mural at 49 Main Street in Livingston Manor, New York featuring a series of colors evoking a fishing landscape and the phrase "You only really find that sense of calm when you're not looking for it," which was installed in the summer of 2024. This mural also displays the name of the business that occupies the building on which the mural was painted.

131.    Both of these murals are within the Town's jurisdiction.

132.    On information and belief, no permit was obtained prior to either of these murals being installed.

133.    On information and belief, no citations have been issued in relation to either of these murals.

134.    On February 3, 2026, Carnes' counsel sent a Freedom of Information Law ("FOIL") request to the Town of Rockland, seeking "any permits, approvals, complaints, or enforcement actions (or decisions not to enforce) under the Town of Rockland's signage ordinance relating to the exterior murals located at 66 Stewart Avenue (Trout Town Flies) in Roscoe, New York and 49 Main Street (Corners) in Livingston Manor, New York."

135.    On February 18, 2026, the Town Clerk sent Carnes' counsel the Town's FOIL response, which did not include any permits, approvals, complaints, or enforcement actions related to either of these murals or any other murals. The Town Clerk did not indicate that any responsive materials had been kept out of the production.

22

136.    Members of the Town of Rockland town board have expressed enthusiasm at other murals being painted in the Town. *See* Angie Hund, "Artist's Creation Celebrates Fly Fishing," *Manor Ink* (Nov. 2023) at 24.

137.    The Town's enforcement action regarding Carnes' mural was not based on neutral zoning concerns but was triggered by objections to the Mural's message by a politically connected member of the community and by government actors within the Town, including Town Supervisor Eggleton and Town Code Enforcer Gabbard.

138.    The Town's actions targeted Carnes' ongoing artistic and political expression based entirely on its expressive content and their understanding of its political message.

139.    Carnes ceased work on the Mural initially due to the threat of an enforcement action, and then due to the actual citation threatening fines and imprisonment.

140.    If the citation and threat of enforcement were rescinded, Carnes would be able to repaint the Mural.

141.    Since at least August 5, 2025, the Town and its agents have sought to pressure the Building Owners to cause the Mural to be removed or painted over, including by issuing and/or threatening enforcement action and penalties relating to the Mural. This pressure interferes with the existing arrangements governing the Mural, including the Sunday Home's lease and Carnes' agreement with Sunday Home regarding creation and display of the Mural.

142.    On information and belief, the Town's pressure has included heightened and/or selective code enforcement actions directed at other properties owned by the

Building Owner Defendants, undertaken in connection with the Town's efforts to secure removal of the Mural.

143. As a result of the Town's pressure and threatened enforcement consequences, Defendant Sferrazza, who initially supported the Mural or stated he wanted to stay out of the dispute, changed his position, inquired about the legality of painting over the Mural, and then eventually participated in the destruction of the Mural.

144. Defendant Sferrazza's change in position was motivated by the Town's threatened enforcement consequences, including the citation's threat of fines and imprisonment.

145. For example, on or about February 18, 2026, Defendant Sferrazza went to the New York State Police barracks in Roscoe and asked the officer on duty whether it would be legal for him to paint over the mural. The Building Owner stated that he was tired of being pressured by the Town regarding the Mural.

146. But for the Town's citation and threatened penalties, Defendant Sferrazza would not have opposed the Mural.

147. The Town's actions thus chilled, and continue to chill, Carnes' ongoing artistic and political expression.

148. As a direct result of the Town's actions, Carnes has suffered concrete economic harm. Pursuant to the agreement with Sunday Home, Carnes bore ninety-three (93) percent of the mural's costs, including materials, scaffolding, and related expenses, in exchange for the right to display the completed mural for at least two years. Because the Town's enforcement actions prevented Carnes from completing the mural, Carnes has been deprived of the benefit of that bargain, i.e., a completed, publicly displayed artwork that

24

was central to the Miniluv project and Carnes' professional portfolio. Carnes has also lost the opportunity to leverage the completed mural for future commissions, exhibitions, press coverage, and public engagement with his artistic work.

149. In this vein, the Town's actions also cost Carnes the opportunity to paint another mural in the hamlet of Narrowsburg, also in Sullivan County, roughly thirty miles south of Roscoe. The business that planned to host the mural had reservations after learning of the enforcement actions taken by the Town regarding the Mural.

150. Carnes was also offered the opportunity to install a similar mural to the Mural in the nearby town of Liberty, but the other parties involved are now hesitant for the same reasons as the business in Narrowsburg.

**Municipal Liability Facts**

151. The Town's agents in supervisory roles acted under color of state law.

152. The Town's actions were undertaken pursuant to the Town's policy, custom, and/or practice of enforcing the sign ordinance in a manner that suppresses disfavored speech.

153. Section 185-30.2 of the Town Code was enacted, adopted, maintained, and enforced by the Town through its governing authority, including the Town Board.

154. Town Supervisor Eggleton acted as a policymaker in practice for purposes of directing the Town's response to the Mural and the decision to invoke code enforcement to suppress it. Acting in his official capacity, his decision to direct enforcement was never reversed or disavowed by the Town Board or any other Town authority.

155. On information and belief, Town Supervisor Eggleton exercised de facto final decision-making authority over whether the Town would pursue enforcement relating

to the Mural, directing the Code Enforcement Officer to issue a citation in his official capacity as Town Supervisor. The Town Board – the body formally responsible for the Code Enforcement Officer under the Town's Zoning Law – never reversed or disavowed the Town Supervisor's decision, and no other Town official or body provided any oversight of or check on that decision. The Town Supervisor's direction was treated as the final word of the Town.

156.    Alternatively, the Town Board ratified the enforcement action. After receiving notice of the First Amendment issues raised by the citation and threats, the Town through its Town Board and Town Attorney failed to rescind the citation, failed to disclaim future enforcement, and thereby approved and continued the unconstitutional conduct. The Town Board's ratification is particularly significant because it is the body formally vested with authority over zoning enforcement under the Town Code. Its deliberate inaction in the face of specific, repeated notice of the constitutional violation – including Carnes' counsel's letter of October 8, 2025 and the Notice of Claim of October 17, 2025 – constitutes adoption of the unconstitutional enforcement as official municipal policy.

157.    Town Supervisor Eggleton encouraged or directed Town Code Enforcer Gabbard to issue the citation, which Code Enforcer Gabbard did despite recognizing the Mural contains protected speech.

158.    Town Supervisor Eggleton was personally involved in coercing Carnes to change the expressive content and message of the Mural, directed Town Code Enforcer Gabbard to issue a citation, and, on information and belief, continued to pressure the Building Owners.

26

159.    In practice, Town Supervisor Eggleton exercised unreviewable discretion over the decision to initiate enforcement relating to the Mural. Acting in his official capacity as Town Supervisor, he received a complaint about the Mural's expressive content, communicated with Carnes about the Mural, determined that enforcement was warranted, and directed Town Code Enforcer Gabbard to issue the citation, all without the Town Board or any other reviewing body reversing or disavowing the citation.

160.    In practice, Town Supervisor Eggleton's direction to initiate enforcement and Town Code Enforcer Gabbard's issuance of the citation in their official capacities were treated as final by the Town Board and any other Town authority. They were never reversed or overridden by the Town Board or any other Town authority.

161.    On information and belief, the Town maintained a policy or custom of enforcing the signage ordinance in response to complaints about unfavored expressive content.

162.    On information and belief, the Town permitted unbridled discretion in determining what constituted a "sign" subject to enforcement.

163.    This is evidenced by the fact that there are at least two other murals of comparable size within the Town that did not apply for permits, were not provided with permits, and yet were not issued citations.

164.    The Town also failed to train and supervise its officials regarding the obvious First Amendment risks created by a sign ordinance that requires content review to determine exemptions and enforcement.

165.    Given the ordinance's content-based exemption structure, the need for training and standards to prevent censorship and unbridled discretion is obvious.

27

166. The Town's failure to provide such training and standards constitutes deliberate indifference to constitutional rights.

167. The Town's actions were taken despite clearly established law and the fact that Defendants had been informed that attempting to repress or censor Carnes' speech was violative of Carnes' free speech rights.

168. The Town's ratification is further evidenced by the conduct of its officials following notice of the constitutional violation. After receiving Plaintiff's counsel's letter of October 8, 2025, the Notice of Claim of October 17, 2025 – each of which identified the First Amendment violations at issue – no member of the Town Board, nor the Town Attorney, nor any other Town official took any action to rescind the citation, halt enforcement, or distance the Town from the actions of Town Supervisor Eggleton and Town Code Enforcer Gabbard. Instead, on information and belief, the Town continued to pressure the Building Owners. The Town's silence and continued enforcement in the face of repeated, specific notice of the constitutional violation constitutes ratification of the unconstitutional conduct as official municipal policy.

169. The Town's actions lack narrow tailoring and were not supported by any compelling governmental interest.

170. In sum, under the Town's actual decision-making structure, Town Supervisor Eggleton, acting in his official capacity, directed that the signage ordinance be enforced against the Mural; Town Code Enforcer Gabbard then carried out that directive by issuing the citation and threat of penalties; and although the Town Board possessed the authority to rescind, override, or otherwise halt that enforcement action, it did not do so even after receiving detailed notice from Carnes' counsel that the citation targeted

protected expression and lacked a lawful basis. Nor did the Town Attorney disavow the enforcement action or advise that it had been issued in error. Instead, after notice and an opportunity to correct the violation, the Town, through its governing body and legal counsel, allowed the enforcement decision to stand as the Town's final position, thereby ratifying and adopting the censorship of Carnes' protected speech as municipal policy.

### Plaintiff's First Amendment Standing

171.    Carnes' standing to bring this action does not depend on having been personally named in the citation. Defendants deliberately targeted the Building Owner Defendants as a means of suppressing Carnes' speech, knowing that enforcement pressure on the property owner could effectively prevent Carnes from completing or displaying the mural. The citation was the mechanism through which the Town accomplished the censorship they had announced to Carnes directly and explicitly.

172.    Carnes continues to face a credible, non-speculative threat of continued enforcement. Town Supervisor Eggleton personally told Carnes that his mural required a permit and that he would direct the Town Code Enforcer to act. Within days, Town Code Enforcer Gabbard issued a citation. The Town has never withdrawn, rescinded, or disclaimed the citation, nor have they provided any assurance that Carnes will not face additional enforcement – including fines or imprisonment – if he repaints the Mural. Under these circumstances, Carnes' decision to cease painting was objectively reasonable and directly attributable to the Town's conduct.

173.    The ongoing enforcement posture has also caused continuing injury beyond the initial chill. As a direct consequence of the citation and the Town's sustained pressure on the Building Owners, the Building Owners, who initially supported the Mural, have

shifted from neutrality to active opposition, culminating in the removal of Carnes' surveillance camera in February 2026 and painting over the Mural in March 2026. Each of these downstream consequences is traceable to the Town's enforcement actions and would be redressed in part by the declaratory and injunctive relief Carnes seeks.

**Notice of Claim and 50-h Hearing**

174.    On October 17, 2025, Carnes, through counsel, served a notice of claim on the Town.

175.    On November 7, 2025, Carnes served a supplemental notice of claim regarding damages on the Town at the Town's counsel's request.

176.    The Town scheduled the General Municipal Law 50-h hearing (the "50-h") for January 13, 2026.

177.    On January 9, 2026, the Town's counsel contacted Carnes through counsel and suggested adjourning the 50-h while the parties sought a resolution.

178.    The following day, Carnes responded by laying out his minimum requirements for a resolution, and stating that he was willing to briefly adjourn the 50-h hearing if such a resolution might be possible.

179.    On January 12, 2026, Carnes agreed to a two-week adjournment while the parties tried to find a resolution. The Town's counsel stated she would speak to the Town and get back in touch.

180.    Having not heard back, on January 22, 2026, Carnes' counsel sent a follow up email, asking if the 50-h should be re-calendared. Having again not heard back, on January 27, 2026, Carnes' counsel sent another follow up email, providing Carnes' availability for the 50-h.

181. The same day, the Town's counsel responded that she had not yet spoken with the Town and would get back to Carnes by the end of the week (i.e. January 30, 2026) to reschedule the 50-h if a resolution could not be found.

182. Having again not heard back, on February 3, 2026, Carnes' counsel sent a follow up email, stating that considering the time that has passed, Carnes would proceed with drafting this complaint.

183. The Town's counsel responded the same day, saying she did not expect to be able to follow up with Carnes for three weeks, and did not attempt to reschedule the 50-h.

184. The Town has never objected to Carnes' readiness to appear.

185. Over five months have passed since Carnes served the notice of claim.

186. The Town has never attempted to reschedule the 50-h.

187. On the basis of the above, the Town has waived its right to a 50-h hearing.

## CLAIMS FOR RELIEF

### COUNT I
### (Violation of the First Amendment – 42 U.S.C. § 1983)
### (Against the Town of Rockland)

188. Plaintiff repeats and realleges paragraphs 1 through 187 as if fully set forth herein.

189. Plaintiff's Mural constitutes artistic and political expression protected by the First Amendment to the United States Constitution.

190. The Town, acting under color of state law, restrained and suppressed Plaintiff's protected expression by threatening enforcement of the Town's signage

ordinance and by issuing a citation that demanded the Mural be removed or altered under threat of fines and imprisonment.

191. The Town's actions constituted content-based retaliation on Plaintiff's expression, as they were motivated by the Town's disagreement with, and objection to, the Mural's message and perceived political meaning.

192. The Town's enforcement was not narrowly tailored to serve a compelling governmental interest and was not based on neutral zoning concerns.

193. The Town's signage ordinance, section 185-30.2 of the Town of Rockland Code, both on its face and as applied to Plaintiff's Mural, vested the Town with unbridled discretion to suppress expressive conduct based on content, in violation of the First Amendment.

194. The Town's signage ordinance is unconstitutional on its face and as applied to Plaintiff's Mural because it requires Town officials to examine and evaluate the content of expressive speech in order to determine whether a permit is required, vests enforcement officials with unbridled discretion, and operates as a prior restraint on protected artistic and political expression.

195. The Town's signage ordinance draws content-based distinctions among categories of speech. It exempts, among others, political signs and political advertising, statements of personal opinion and statements of protest, signs of civic, philanthropic, educational, and religious organizations, memorial plaques and historical tablets, real estate sale and rental signs, and "no trespassing" and "warning" signs, while subjecting other expressive content to a discretionary permit regime. The Town's exemptions and prohibitions cannot be applied without examining the content of the speech regulated.

196.    The ordinance further operates as a facially unconstitutional prior restraint. It conditions expressive speech on the discretionary issuance of a permit by the Code Enforcement Officer without narrow, objective, and definite standards, and incorporates content-based decisional criteria – including that the "size and content of the sign shall be the minimum essential for legibility" and that "garish" colors and materials "should be avoided" – that vest unbridled discretion in enforcement officials.

197.    The ordinance is also facially overbroad and impermissibly vague, including in its expansive definition of "sign," which reaches a substantial range of protected expression including murals and other artistic works, and in its prohibition on signs of "an indecent or obscene nature," which sweeps beyond unprotected obscenity.

198.    The Town further retaliated against Plaintiff for engaging in protected expression by threatening enforcement and issuing a citation after Plaintiff refused to alter or abandon the Mural's message.

199.    The Town's actions would deter a person of ordinary firmness from continuing to engage in protected artistic and political expression.

200.    As a direct and proximate result of the Town's actions, Plaintiff ceased work on the Mural, suffered loss of expressive opportunity, and experienced an ongoing chilling of his artistic and political speech.

201.    The Town's actions also led to Plaintiff losing other opportunities, including at least one opportunity to paint another mural in a nearby town, as the business that was planning to host the mural did not want to risk being dragged into a dispute with local government.

202. The Town's actions also caused Plaintiff emotional distress and caused him to quickly vacate his home in the Town, sacrificing his security deposit.

203. The Town's actions violated Plaintiff's rights under the First Amendment to the United States Constitution.

## COUNT II
### (Municipal Liability – *Monell* – 42 U.S.C. § 1983)
### (Against the Town of Rockland)

204. Plaintiff repeats and realleges paragraphs 1 through 187 as if fully set forth herein.

205. The Town is liable for the constitutional violations described herein because those violations were caused by official policy, custom, or decision attributable to the Town.

206. The Town's constitutional violations were caused by the Town's policies, customs, and practices, including but not limited to:

   a. selective, content-based enforcement of the sign ordinance against disfavored speech;

   b. ratification by policymakers of unconstitutional enforcement decisions;

   c. failure to train and supervise officials regarding First Amendment constraints in enforcing an ordinance that requires content review; and

   d. maintenance of an ordinance and enforcement regime that vests unbridled discretion in officials.

207. In practice, Town Supervisor Eggleton exercised de facto final policymaking authority with respect to the Town's enforcement of its signage ordinance against the Mural, acting in his official capacity as the Town's Chief Executive Officer.

The Town Board never reversed or disavowed the Town Supervisor or Town Code Enforcer's enforcement decision, and no other Town authority provided any check on it.

208. Town Supervisor Eggleton directed, encouraged, or approved Town Code Enforcer Gabbard's enforcement action against Plaintiff's Mural.

209. In other words, acting in his official capacity as Town Supervisor, the Town's Chief Administrative Officer responsible for day-to-day operations, Town Supervisor Eggleton directed Town personnel to initiate and pursue enforcement relating to the mural, and Town personnel treated that directive as controlling. The Town Board never reversed or disavowed that directive, despite being informed of the constitutional violation.

210. Town Code Enforcer Gabbard acted in his official capacity with regard to the issuance of the citation. His decision to issue the citation in response to the Town Supervisor directive was never reviewed, reversed, or overridden by the Town Board or any other Town authority.

211. The Town's actions constituted an official decision by final policymakers of the Town.

212. In addition, the Town maintained a policy or custom of enforcing the signage ordinance in response to complaints about disfavored expressive content, while declining to enforce the ordinance against other similarly situated murals.

213. The Town further maintained a policy or custom of permitting unbridled discretion in determining what constitutes a "sign" subject to enforcement, without narrow, objective, and definite standards.

35

214.    The Town's policies, customs, and official decisions were the moving force behind the deprivation of Plaintiff's First Amendment rights.

215.    Through an attorney letter sent to the Town on October 8, 2025, informing the Town that its chilling of Carnes' speech was unconstitutional, Carnes' notice of claim submitted on October 17, 2025, and several conversations with individuals in the Town's leadership, the Town had considerable notice of the constitutional defects in the citation and its enforcement threats.

216.    Nonetheless, the Town, through its policymakers, failed to rescind the citation, failed to disclaim future enforcement, and continued the enforcement posture, thereby ratifying and adopting the unconstitutional conduct as municipal policy.

217.    In sum, the Town's enforcement against the Mural was undertaken pursuant to municipal policy, custom, and ratification. Acting in his official capacity, Town Supervisor Eggleton directed that the signage ordinance be enforced against the Mural, Town Code Enforcer Gabbard carried out that directive, and the Town thereafter adopted and ratified that enforcement action by allowing it to stand without rescission or disavowal despite notice that it targeted protected expression.

218.    As a direct and proximate result of the Town's actions, Plaintiff suffered the injuries alleged herein.

## COUNT III
### (Violation of Article I, §§ 8 and 11 of the New York Constitution)
### (Against the Town of Rockland)

219.    Plaintiff repeats and realleges paragraphs 1 through 187 as if fully set forth herein.

36

220.     Article I, §§ 8 and 11 of the New York Constitution provide broader and independent protections for freedom of speech and expression.

221.     The Town violated Plaintiff's rights under the New York Constitution by suppressing and restraining Plaintiff's artistic and political expression through content-based enforcement of the Town's signage ordinance.

222.     The Town's actions constituted unlawful retaliation and an impermissible exercise of discretionary licensing authority over protected expression.

223.     In addition, the Town's signage ordinance, section 185-30.2 of the Town of Rockland Code, violates the New York State Constitution on its face and as applied to Plaintiff's Mural because it requires Town officials to examine and evaluate the content of expressive speech in order to determine whether a permit is required, vests enforcement officials with unbridled discretion, and operates as a prior restraint on protected artistic and political expression.

224.     The Town's signage ordinance on its face unconstitutionally draws content-based distinctions among categories of speech – exempting, among others, political signs and political advertising, statements of personal opinion and statements of protest, signs of civic, philanthropic, educational, and religious organizations, memorial plaques and historical tablets, real estate sale and rental signs, and "no trespassing" and "warning" signs – while subjecting other expressive content to a discretionary permit regime. The Town's exemptions and prohibitions cannot be applied without examining the content of the speech regulated.

225.     The ordinance further operates as a facially unconstitutional prior restraint. It conditions expressive speech on the discretionary issuance of a permit by the Code

Enforcement Officer without narrow, objective, and definite standards, and incorporates content-based decisional criteria – including that the "size and content of the sign shall be the minimum essential for legibility" and that "garish" colors and materials "should be avoided" – that vest unbridled discretion in enforcement officials.

226.    The ordinance is also facially overbroad and impermissibly vague, including in its expansive definition of "sign," which reaches a substantial range of protected expression including murals and other artistic works, and in its prohibition on signs of "an indecent or obscene nature," which sweeps beyond unprotected obscenity.

227.    Plaintiff served a timely Notice of Claim and satisfied all conditions precedent to asserting claims under New York law, or such conditions have been waived by the Town for failing to reschedule the 50-h hearing.

228.    Plaintiff seeks declaratory and injunctive relief for the Town's violations of the New York Constitution and, to the extent no alternative remedy is available, such other relief as may be appropriate.

229.    Plaintiff does not seek duplicative damages under this Count for injuries fully redressable under 42 U.S.C. § 1983, and pleads this claim solely to preserve any non-duplicative relief available under New York law.

**COUNT IV**
**(Violation of the Visual Artists Rights Act, 17 U.S.C. § 106A)**
**(Against Trout Town Properties 48 LLC and Daniel Sferrazza)**

230.    Plaintiff repeats and realleges paragraphs 1 through 187 as if fully set forth herein.

231.    The Mural is a work of visual art within the meaning of 17 U.S.C. §§ 101 and 106A.

38

232.     Plaintiff is the author of the Mural and owner of the moral rights granted by 17 U.S.C. § 106A.

233.     Plaintiff did not waive his rights under VARA in a writing signed by Plaintiff and specifically identifying the work and the uses of the work to which any waiver would apply.

234.     The Mural was painted directly onto the exterior wall of the building and could not be removed without destruction, distortion, mutilation, or other material alteration.

235.     The Mural occupied a recognized place within Plaintiff's established body of work and was regarded by those familiar with that work as a significant piece within the Miniluv project. Members of the relevant art community viewed the Mural as a serious contemporary artwork engaging political language, censorship, and public discourse through a literary reference to Orwell. By virtue of its artistic quality, conceptual content, public presentation, and recognition by artists, curators, and art institutions, the Mural had achieved recognized stature within the meaning of 17 U.S.C. § 106A(a)(3)(B) before its destruction.

236.     Building Owner Defendants intentionally, or with gross negligence, destroyed the Mural by causing it to be painted over, or by authorizing, ratifying, directing, permitting, and/or failing to prevent that destruction.

237.     In the alternative, by painting over the Mural, Building Owner Defendants intentionally distorted, mutilated, or modified the Mural in a manner prejudicial to Plaintiff's honor or reputation, in violation of 17 U.S.C. § 106A(a)(3)(A).

238.    Building Owner Defendants' conduct violated Plaintiff's rights under the Visual Artists Rights Act, including but not limited to his right to prevent the intentional distortion, mutilation, or modification of the Mural and his right to prevent the destruction of a work of recognized stature.

239.    As a direct and proximate result of Building Owner Defendants' conduct, Plaintiff has suffered damages and is entitled to actual damages and/or statutory damages, together with attorneys' fees and costs to the fullest extent permitted by law.

240.    Plaintiff also seeks such declaratory and other relief as the Court deems just and proper.

## IRREPARABLE HARM AND INJUNCTIVE RELIEF

241.    Plaintiff has suffered and will continue to suffer irreparable harm as a result of the Town's unconstitutional conduct.

242.    The suppression and chilling of Plaintiff's protected artistic and political expression constitute irreparable injury for which there is no adequate remedy at law.

243.    Absent injunctive relief, the Town's ongoing and threatened enforcement of the Town's signage ordinance will continue to restrain Plaintiff's exercise of his First Amendment rights.

244.    The balance of equities and the public interest strongly favor injunctive relief, as the enforcement at issue suppresses core political and artistic expression protected by the United States and New York Constitutions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court order:

A. A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that the Town's actions in enforcing and threatening to enforce the Town of Rockland's signage ordinance against Plaintiff's mural, an artistic work of expression, violated Plaintiff's rights under the First Amendment to the United States Constitution and Article I, §§ 8 and 11 of the New York Constitution;

B. A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that Plaintiff's mural is a protected artistic work of expression and not a "sign" under the Town of Rockland's signage ordinance, or is exempt as political expression or an expression of personal opinion;

C. A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that section 185-30.2 of the Town of Rockland Code is facially unconstitutional under the First and Fourteenth Amendments to the United States Constitution and Article I, §§ 8 and 11 of the New York Constitution;

D. A declaratory judgment declaring that Defendants Trout Town Properties 48 LLC and Daniel Sferrazza intentionally, or with gross negligence, destroyed, mutilated, defaced, and/or caused the destruction of Plaintiff's mural in violation of the Visual Artists Rights Act, 17 U.S.C. § 106A;

E. Preliminary and permanent injunctive relief enjoining the Town, its officers, agents, employees, and all persons acting in concert with them from enforcing the Town of Rockland's signage ordinance against Plaintiff's mural based on its content, message, or expressive nature, and from otherwise interfering with Plaintiff's completion and display of the mural;

F.  Preliminary and permanent injunctive relief enjoining the Town, its officers, agents, employees, and all persons acting in concert with them from enforcing section 185-30.2 of the Town of Rockland Code based on the content of expressive speech;

G.  A preliminary and permanent injunction enjoining Defendants, and all persons acting in concert with them, from directly or indirectly threatening, pressuring, coercing, or encouraging any person, including, without limitation, the owner or operator of 48 Stewart Avenue or any agent, tenant, or contractor, to paint over, remove, deface, obscure, or otherwise alter the mural at issue if repainted, and from initiating or threatening any enforcement action, inspection, citation, or other adverse municipal action against the mural or any person associated with it in retaliation for, or because of, Plaintiff's protected expression and viewpoint;

H.  Compensatory damages in an amount to be determined at trial against the Town for the loss of expressive opportunity, emotional distress, and other injuries suffered by Plaintiff as a result of the Town's conduct; and against Defendants Trout Town Properties 48 LLC and Daniel Sferrazza for violation of Plaintiff's rights under the Visual Artists Rights Act, 17 U.S.C. § 106A;

I.  In the alternative to actual damages, statutory damages to the fullest extent permitted by law for Defendants Trout Town Properties 48 LLC and Daniel Sferrazza's violation of Plaintiff's rights under the Visual Artists Rights Act and other applicable provisions of the Copyright Act;

J.  An award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provision of law;

K.  Reasonable attorneys' fees and full costs against Defendants Trout Town Properties 48 LLC and Daniel Sferrazza pursuant to 17 U.S.C. § 505;

L.  Pre-judgment and post-judgment interest as allowed by law;

M.  Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Dated: May 11, 2026
       Germantown, New York

Respectfully Submitted,

/s/ Jeff Kinkle/
Jeff Kinkle
Kinkle Law PLLC
26 Camp Creek Road
Germantown, NY 12526
646-467-3240
jeff@kinklelaw.com

*Attorney for Plaintiff*

43